Case number 17-5277, Keith Saunders v. Ford Motor Company, et al. Argument not to exceed 15 minutes per side. Mr. Abel, you may proceed for the appellant. May it please the Court. Your Honor, Brian Abel, Louisville, Kentucky, for the appellant Keith Saunders. We're here today asking for reversal and remand for a case in the District Court on a Rule 56 Motion for Summary Judgment. We believe that there are genuine issues of material facts and that Keith Saunders should obtain a jury trial on that. This case is a case about a union worker, Keith Saunders. We have a lot going on in this case. The first issue is… Is he still working at the company? He is still working at the company. I talked to him yesterday. He is back in the Brooks Hospital for stress and anxiety. And the litigation and other workplace issues continue to exacerbate his conditions. We've continued to reach out to Ford, trying to get this resolved, trying to get him back home in Minnesota where he needs to be with his family. So that's his current situation. And he will continue to be employed there for the next 17 years unless we can reach an agreement in the near future. I'm afraid the only way to do that is a reversal and remand and a jury trial, three days, five days. Let a unanimous jury decide whether he was discriminated for filing a workers' comp claim, whether he was discriminated by having his arm destroyed by a machine that Ford had in their plant back in 2001. These are the types of issues that we believe a jury should hear. Now, to get to that, we have to address the Labor Management Relations Act and whether there was a breach of the collective bargaining agreement, CBA, whether he was placed on no work available, NWA improperly, whether the agreement was breached when he tried to be gainfully employed in an area which they had a duty under a collective bargaining agreement to place him. The next component of that would be whether the union failed him in some way. And as the case law makes clear, that we did not have to sue both the union and Ford Motor Company to bring a claim under those acts. And if you start looking at the procedural history, you'll notice that the key signers first tried to get this case out of the federal courts. We tried to appeal to the Kentucky legislatures the discrimination statutes based on key signers' statutory civil rights under KRS 344.040, 342.197, which is the Workers' Compensation Retaliation Act. Now, when you get to filing these complaints for employment discrimination cases, we find that usually they go up on a Rule 12 motion to dismiss. You have this new plausibility standard. And so for every action, there's an equal and opposite reaction. You start getting 50-page complaints. You start having exhibits having to be filed at the time. Tell me the point you're making. Which part of your argument are you arguing right now? What part of my argument? Are you doing the 301 now? Are you doing retaliation? I'm doing the Labor Management Relations Act. 301 claim. The 301 claim. Against the union. Yes, against the union. Well, it was against Ford, and we did not sue the union. We tried to use this union to our advantage by having them on our side, by explaining to them that this would be in the benefit of the union if we get Keith Saunders a jury trial. So how is what the union did arbitrary and in bad faith? I mean, what's your best point on that front? It was against legitimate union objectives. By not filing his grievance within five months, letting the appellees have an argument that it was time barred, that they did not have a legitimate union objective to do that. They let it sit from December 2013 until May 2014 before they filed the grievance, which the record will reflect testimony. Just to make sure I'm not losing track of the case, is this the one where they'd already pursued it at a couple levels and then didn't pursue it anymore? Well, there were union grievances filed that did make it to, I believe, two levels. And Keith Saunders had two grievances in this case. I'm just making – I guess the point I'm making is that doesn't sound like a union that's discriminating against someone or acting arbitrarily. They're pursuing it. Just because you start pursuing something doesn't mean you have to pursue it all the way to the end, right? I mean, sometimes people shouldn't appeal because it's just not a strong claim. Sure. And to that end, I would suggest to the court that the grievance in question that did not make it past the level two was for a variety of people, a variety of employees that were on no work available. It was not Keith Saunders alone that was in that grievance. So what does that – just explain what that means. How does that help you? How does that help us? It helps us because, for example, perhaps there was other no work available employees that had been placed in what Ford calls a dry program. Maybe there was no need to take the grievance any farther simply for Keith Saunders. Now, Keith Saunders had a second grievance in December of 2013, his sole and only grievance, which was for Keith Saunders alone, that sat dormant or empty from December until May of 2014 when they thought that he resigned. How many grievances has the union filed for Mr. Saunders over the course of his career? How many? Roughly ballpark it. Roughly ballpark? I believe that it's under 10. I came in the case in the year 2014. He's been working there since 2001. Isn't that above the average? It may be above the average. Now, we must understand that we're here to address the individual litigant, Keith Saunders, who has a history of depression and has a history of anxiety. Now, the eggshell plaintiff is still a plaintiff, and it's been recognized by the courts and our jurisdiction and our republic as being a person, an individual litigant, who has a right to be heard by a fair and impartial jury. Doesn't a union have a right to determine that a grievance proposed is non-meritorious and not pursue it on that basis? I don't believe so. I believe that any person that pays a union due that has a problem or a grievance is entitled to file a grievance, and that is mandatory that the union does something with it and not put it in their desk drawer and wait five months. I do believe that because Keith Saunders is a union member, he pays his dues. I don't know that you're answering Judge Strang's question. I think what she's saying is doesn't the union – the union has an obligation every time they hear from a member that there's a problem, they're being discriminated against, whatever, to investigate, and if it's color, we'll pursue it. But isn't the implication in all of that that they have the right from time to time to say, okay, we hear what you're saying, but we really don't think you – the CBA gives you a viable cause of action? They can do that sometimes, right? In the abstract, not as to this case, but in the abstract, they can do that, right? So a local-level bargainer can make that determination? I would disagree with that. I believe that they have a duty to file the grievance, and if it gets dismissed by a board or – But what if it's just foolish? I mean, what if it's a crazy complaint? They still have to file something? Yes, I believe so. He's a union member. So if a plaintiff comes in and says a Martian just landed on my work site and made me do something, and he says file a complaint about the Martian, they have to do that? I believe they have to do that, and then they should call EMS and get him some medical treatment under his rights under the collective bargaining agreement which he paid into. Is there a case law that supports your position? I believe the case law accords the union the responsibility of representing the entire unit, whether they're members of the union or not, and pursuing those things that have some colorable claims. Wouldn't that also be because a union member has a right under the union constitution to challenge a union's refusal to process his grievance, and he does that through complaints, internal union remedies. Did your client pursue any of his internal union remedies? Yes, he tried to pursue his union remedies. We do have two grievances that were indirect. No, no, no. It's a confusing arena, I understand, but there are contractual remedies with the employer and the union. Those are grievances that get filed. There are internal union remedies between a union member and his or her own union, and the constitution, the law, suggests that if a member is unhappy with the union's refusal to further process his grievance, then he or she has the responsibility to raise that issue. And I thought the record said that Mr. Saunders had met with the union representative about the NWA claim, but that he had never again followed up with the union representative concerning that complaint. Isn't that what the record reflects? I believe that Keith Saunders' testimony reflected that he continued to try to talk to union members, and he continued to try to work with Ford directly. So in his day-to-day employment, his number one duty— No, my question is, does the record reflect Mr. Saunders' testimony that after he met with the union representative about the NWA potential grievance, that he never again spoke with a union representative about that grievance? My understanding is that's what the record reflects. Okay. And my understanding is that in December of 2013, he did meet with the bargainer, I believe Fred Willard, and attempted— Yes, December 18. December 2013. He first raised it. Okay. And it did not get in. He tried to have it filed, and it was not filed until May of 2014. But did he follow up in that gap between December of 13 and May of 14? Did he follow up with the union representative? Why are you delaying the filing of my grievance? And, you know, to answer that question, I believe that we have to look at the context of where he was. Was he in medical treatment? He very well could be. This case is— Yes, but your answer is there's nothing in the record that reflects he checked with his union representative in that five-month period. Well, I would believe—my answer to that, Your Honor, is that there very well is information in the record that he did follow up. I believe that his testimony would be that he continued to call and ask around and continued to stop at the local union shop, which is close to the Ford plant. His testimony would be—are you referring to what you think he would say in the future, or are you referring to what he actually has said so far? Sure. And his deposition testimony was however many pages, you know, whether that specific line is in there. I do know that the record— So he hasn't yet said this in his deposition. He didn't say it in his deposition. You're saying he might say it at a trial. Is that the point you're making? I believe that he did say it in his deposition. I just don't have the page number to cite to you right now about that. But it was filed into the record. It's there. It's for review. We cited the pertinent parts for a dispositive motion, which is a procedural device to get out of having to conduct the logical conclusion of this, which would be to have a fair-minded jury sit and listen to the facts and determine for themselves whether, you know, this person Keith Saunders was discriminated against and retaliated against and so forth and so on, but whether he followed up in this time frame. My answer to that is yes, that he did follow up in this time frame and that he did continue to stop by the union office regularly to talk to them about union issues and grievances. If the deposition in fact shows that he says he didn't do that, you may have trouble with that six-month statute of limitations, right? So if his testimony said that he did not, I guess, you know, my retort to that would be whether it was a compound question or whether it could have been construed in different ways. You know, if his testimony of his deposition is that he knows that he did not follow up with anyone about that, well, we would have to put a microscope onto that and go back a few pages, go forward a few pages and essentially look at the complete deposition transcript and find out exactly what he said and what he meant by what he said. You know, and those are questions, those are factual issues for a jury to decide, Your Honor. And that is, you know, under the case law that we have in front of us is the way that it would continue to pursue. Let me shift you for a moment to your workers' comp retaliation claim. Yes, sir. Now, your client reopened his workers' comp claim in July of 2013, did he not? Yes. Going back to his 2001 arm injury. Yes. All right. The next month he's put on NWA. Correct. And you're saying that's sort of the causal link of, oh, that putting him on NWA in August of 2013 was in retaliation for him reopening his workers' comp claim the month before. The month before. So now we get into – But I guess my question is that in August of 2013, though, your man was taken off of NWA, put in the paint department, because they decided he could maybe work in the paint department. But then the fumes got him. He says, no, I can't work there. He even got his own doctor's private certificate saying, don't put my man Saunders in the paint department. That's when he was put on the NWA. So, I mean, isn't that the reason he was put – It wasn't because in retaliation for his workers' comp claim reopened the month before, but because he couldn't work in the paint department that Ford tried to put him in. But he's also a well-qualified torque route inspector that they brought him in and jumped him two lines of seniority and kept him there for a year. Why are they placing this man who has this advanced knowledge to train other people in a paint department where he is continually complained about issues with his health and what he can and cannot do? Did he object to going to the paint department at the outset? At the outset, I'm not sure if he did. He's a union guy. He follows the rules. He shows up and sees if he can do the job. He could not do the job, and it eventually led to him back into being admitted inpatient into the hospital. All right. You'll get your phone rebuttal. Thank you, Your Honor. May it please the Court. Jessica Curry on behalf of the defendants. Ford has been accommodating plaintiffs since 2001. He's held many jobs, and they've only ended because they were temporary to begin with, the plaintiff presented with new restrictions, or he went out on medical leave. Admittedly, the plaintiff's employment history is extensive, but the material facts in the record are very few, and that's because the LMRA, which plaintiff concedes applies to all but his workers' comp claim, requires him to have exhausted the grievance process. He admits he's done that only two times. Therefore, the material facts fall into three narrow categories, facts about the 2013 grievance that plaintiff relies on, facts about the 2014 grievance that plaintiff relies on, and facts that postdate his motion to reopen his workers' comp claim that he points to as evidence of retaliation. When you look at those facts in plaintiff's favor, there is no question of fact for a jury, and this Court should affirm summary judgment in favor of the Ford defendants. Beginning with the LMRA claims, there's no dispute on the law. Plaintiff agrees he's got to show both a breach of the duty of fair representation by the union and a breach of the collective bargaining agreement. He has pointed to no facts to create a question of fact for a jury for either grievance. The 2013 grievance that was filed by bargainer Hibbs, alleging that individuals on no work available leave should have been used for a temporary drive position. Plaintiff has abandoned any claim based on that grievance. His only reference to the 2013 grievance in his brief is on page 13 where he says that it was filed. There's no attempt to explain why the union breached its duty and why not using individuals on no work available leave breached the contract. This is the one the union dropped two years later, right, in 2015? That's correct. Bargainer Hibbs pursued this for two years. Why did it go on for two years? Because I thought the process was very quick. Within two days you do this and another week you do that. Why would it drag on that long? The process is quick as far as initiating it from the initial oral discussion and advancing it to a unit committee, but there are several appeal processes and steps along the way. There was some delay in getting the list of no work available individuals that bargainer Hibbs needed in order to pursue it. If I recall, Ford's reason for denying the 2013 grievance was, well, these positions for medically challenged employees is only available for permanent jobs, not temporary. Is that Ford's position? That's correct. What basis in the record is there that backs you up? Is there anything in the letter of understanding or the CBA or anything that says, oh, these positions can only be for permanent positions, not temporary? Yes, there is, and in the letter of understanding it contemplates a process. The committee meets once a week, so it's not an instantaneous process, and then there's testimony in the record that shows a doctor has to go out and evaluate the jobs, and that can take several days. So when you have a very temporary job, and in this case we've got a very short driving opportunity, there's just not practically a way to get that kick-started. The claim was for 80 hours, right? Eighty hours, two weeks' worth of work, and the company in its discretion felt it was most appropriate to use available assemblers that are already there to fill these temporary needs. And it can do that within its discretion under the collective bargaining agreement, Article 8, Section 27, which where the collective bargaining agreement doesn't otherwise require employing the individuals with injuries, it's in the discretion of the company. The letter of understanding does not explicitly say these positions have to be permanent as opposed to temporary. You're just saying the practicalities are that Ford doesn't do it for temporary positions? That's correct, for practical reasons. Temporary jobs just aren't conducive to the placement process, and to the extent that the collective bargaining agreement doesn't explicitly say permanent, the court can look to external evidence and did so in Wilson, a case cited in our brief, where it was unclear whether an individual could grieve on behalf of other people in the unit, and that wasn't expressly stated in the collective bargaining agreement, but the court then turned to extrinsic evidence, and here we have a lot of that. First of all, Plaintiff, in his own testimony, says his understanding of medical placement is a permanent job, and actually he complains about a job that he was removed from that he thought, oh, this was a medical placement, and so it should be permanent. You've also got testimony by Jeffrey Margin where he says once somebody's medically placed, he can't remove them, and that's at page ID 1284. He also says at 1301 that you can't displace another worker. In the 2014 grievance, this five-month delay time bar thing, where does that come from, the five months? Usually when you have a limitations period, you have a limitations rule, so how does that work here? Here, the delay in filing the grievance was no fault of the union, and I think as your honors were asking in Plaintiff's presentation, there's just no indication in the record that Plaintiff approached the bargainer sooner than May 16, 2014. When he approached Bargainer Willard, Bargainer Willard filed the grievance the exact same day, stated May 16, 2014, the exact same day that Plaintiff approached him. Now, he was out on no work available leave or medical leave, but he admits in his deposition that there was nothing that prevented him from calling Labor Relations. He just didn't. He just didn't call, but he did call the medical department, so he was capable of reaching out to the company and did reach out to management, but the avenue in which he needed to pursue was through the union, and there's no evidence in the record. Maybe I'm not getting your response. I thought the point was five months was too long a delay to pursue this, and I'm asking you where does five months go? How was someone notified that if you wait that long, you're in trouble? How does someone know that ahead of time? Five months isn't the time frame. It's actually much shorter, and so five months was just way past the deadline, and if you look at there's excerpts of the collective bargaining agreement. So it lays out what, that it's two weeks or three weeks? Yeah, it's a matter of weeks. It's days right at the beginning. That's correct. Oral step is days. So the question becomes what evidence is there in the record regarding his claim, Saunders' claim that he made a request of the union on December 18 of 2013 to process that grievance? There's no evidence in the record to that effect. It's not stated in the grievance. It's not in his deposition testimony. He's asked about the timing problem in his deposition, and what he says is, I was on the outside looking in, and then so there's follow-up questions, and it's, well, could you have called? And he says, there's nothing that would have prevented me from calling. What does the CDA say if it lays out these time rules? Does it have exceptions? Does it say, well, if you missed the 10-day one, you have an exception for good cause as long as three months, or is it just silent? It just says, do this, you have this amount for this one, you have this amount for that one, and then is that how it works? Or does it actually have something that says, if you wait later, end of story, or if you wait later, okay, as long as you have good cause? So there is no exception that is laid out in the grievance procedure, and that starts on page ID 1535. And is the norm if it's one day after that's the end of the story? Because I would be surprised if that were true. I think that there probably would be exceptions that the union might make, but there is no indication that any of those exceptions were pursued here for a delay that's five months late. The question is whether this implicates the duty of fair representation. So the question is, did he or did he not bring to a union representative in December of 2013 this claim? Because if he brings it and you step into the grievance procedure at the oral stage, then that's what the union is supposed to do. It's supposed to represent him. But your position is that the record reveals that he did not, in fact, bring it to the union on December 18, 2013, that he brought it on May 16, 2014, and the union filed it. But what happened was, by then, it was a stale grievance, because it related to NWA placement in a job in December, and we know that in April, Ford offered him a job in chip and scratch, and he failed to report. And in May, they offered him a different door handle position that was held pending discussions. Is this the record? You need to educate us on whether there is a dispute of material fact as to whether Mr. Saunders raised any claim in December of 2013. Of course. And I would say there's actually two components of it. So he does have to show that he approached the union sooner, okay, such that they could file a timely grievance, but that still wouldn't get him all the way, because that, in and of itself, doesn't show a breach of the duty of fair representation. Again, that duty requires, to have been breached, requires arbitrary conduct, discriminatory conduct, or bad faith. That's a very high standard. So at most, I would say, assuming, and there isn't evidence in the record to support this, but assuming that he approached the bargainer sooner. What I want to know is what evidence there is in the record, because the record is in many ways convoluted. I'm seeing different dates in the two different briefings and a third different date in the court's opinion below. So what does the record show about Mr. Saunders' complaint or discussions or action in December of 2013? In December 2013, there was a conversation with Bargainer Willard, and they met with a nurse and a committee person, and the committee person didn't have any problem with what happened, and it was left at that. So the union chose not to pursue it, having explored it with a company nurse? Correct, and a committee person. And a committee person, yes. And so that would have been your initial oral discussion under the grievance procedures, and then it would have, if plaintiff was inclined to pursue a grievance, and assuming that a bargainer thought that it had merit, it would need to then be elevated within a matter of days to the next process or to the next step, and then, again, a matter of days to be submitted to referral to a unit committee, and none of those steps happened. And so then what you have under the collective bargaining agreement grievance procedure, if a grievance is not processed, it shall be considered settled. And then five months later, we have testimony from plaintiff that he approached Bargainer Willard again and asked him to grieve the issue. Now, Bargainer Willard agreed to do it. But your theory, I gather, is that sometime between mid-December of 2013 and by the end of December or certainly by the end of January of 2014, if he thought he had a claim of the union's breach of the duty of fair representation, his cause of action would have accrued in that time frame, but he didn't file suit in Kentucky State Court until July 30 of 2014. Correct. By then, that was more than six months after his cause of action should have accrued. That's exactly right. Is that your theory? That is the theory, one of them, and it's not one that the trial court actually ruled on, but it is a reason that this court can affirm, at least with respect to that grievance. But in addition, he hasn't shown a breach of the duty of fair representation, and we haven't even addressed yet whether the CBA was actually breached when he was put on no work available leave. And there's every indication that the committee was meeting and was looking into all of these jobs and, in fact, did medically place him in many jobs. It's not an instant process. The testimony from the bargainers even reveals that a one-arm restriction is a very difficult placement, and plaintiff identifies only a few jobs he really can do, an inspector job or driving jobs, and those jobs . . . And following that grievance, June, July, August, so within three months of that grievance, he was placed in the final line inspection position that he still holds today? Yes, that's correct. He still holds that job. This is neither here nor there, but in most 301 cases, isn't the union a party? Usually, yes, but there is no requirement that they be joined. They don't have to be, I see. But the burden . . . The company is in charge of defending the union. In a sense, yes, of course. And it was, as plaintiff has explained, that was the strategy to not name the union in this instance. But the burden, whether or not you have filed a claim against the union, the burden of showing the breach of the duty of fair representation is still exactly the same. And there is simply no . . . It's the plaintiffs to allege and establish. Allege and establish and point the court to the record evidence showing that, and there's simply no evidence of that. Again, it's not a breach of the duty of fair representation to not pursue an untimely grievance. What happens if the company says, well, we think they did breach it? If the company thought that there was a breach . . . I mean, I'm just saying it's a case like this. The union's not sued. The company gets up and says, yeah, I think they did breach it. Go for it. Mr. Saunders, it doesn't affect you, does it? In that hypothetical, I would say the company then would want to just pursue no breach of the collective bargaining agreement. Right. You would say there was no breach, but he would have a claim against the union. Would he ever get relief against the union at that point? Not if there wasn't a breach. No, no, no. Oh, not if there's not a breach of the collective bargaining agreement ultimately because then it would be harmless. I got it. Is that right? Is that what you're saying? That's correct. I got it. Right. Thank you, Your Honors. All right. Thank you. Mr. Saunders, did you reserve, or not Mr. Saunders, Mr. Abel, did you reserve some rebuttal? Yes, Your Honor, we reserved one minute rebuttal time. And thank you for the opportunity to be here today. We requested that the court reverse and remand for a jury trial for Mr. Saunders. We spent a lot of time today talking about the Section 301 claim. But one thing that all parties agree, including the district court, was that Keith Saunders' workers' compensation claim falls outside of that. So if the court scrutinizes the collective bargaining agreement language and ultimately determines that the language was not violated, although Keith Saunders has certainly presented enough evidence showing that he attempted to engage in legitimate union activity in December of 2013, that the union failed him by not processing his grievance until May of 2014, that's still a genuine issue of material fact for a fair-minded jury to hear. But besides that, the state claim for the workers' compensation retaliation falls outside of all the union business, all the 301 claims, all the statute of limitations. He filed his workers' comp claim. He prosecuted all the way through the trial. He obtained affidavits. He obtained deposition transcripts. He served discovery and obtained materials. He made sure that he filed it in the record so that he could show a fair-minded jury what was going on. Kentucky will still use bare-bones jury instructions. Thank you. Thank you so much for your brief oral argument. We appreciate it. The case will be submitted, and the clerk may close.